COURT OF APPEALS
DECISION
DATED AND FILED

December 17, 2019

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2016AP286-CR**

Cir. Ct. No. 2009CF2615

**STATE OF WISCONSIN**

**IN COURT OF APPEALS**
**DISTRICT I**

STATE OF WISCONSIN,

      PLAINTIFF-RESPONDENT,

  V.

CLYDE TALLY,

      DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Milwaukee County: JEFFREY A. CONEN and DANIEL L. KONKOL, Judges. *Affirmed*.

Before Brash, P.J., Kessler and Dugan, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Clyde Tally appeals from a judgment of conviction for one count of first-degree reckless homicide and one count of first-degree recklessly endangering safety.[1] *See* WIS. STAT. §§ 940.02(1) and 941.30(1) (2009-10).[2] He also challenges the denial of his postconviction motions. We affirm.

## BACKGROUND

¶2 On May 25, 2009, the family of Tally's ex-wife had a holiday party where two attendees were shot. One woman died and a young man, Z.R., suffered a gunshot wound to his arm.[3] The criminal complaint alleged that Tally was the man who shot the victims. Tally was charged with one count of first-degree reckless homicide by use of a dangerous weapon and one count of first-degree reckless injury by use of a dangerous weapon.

¶3 According to the complaint, Z.R. told a detective that Tally is his uncle. Z.R. said that Tally came to the family gathering and got into an "altercation." The complaint continues:

> Tally left but came back about 15 to 20 minutes later driving a burgundy work van. Tally once again began arguing back and forth with family members and at this time Z.R. was standing on the front porch in the doorway holding the door open. Tally got back into the van and as Tally was driving off Tally fired several shots in the direction of Z.R. He didn't observe the first shot that Tally shot off but once he heard the initial shot he then looked

---

[1] Tally is represented by counsel on appeal. As we explain in this decision, Tally proceeded *pro se* several times during postconviction proceedings.

[2] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

[3] Throughout this decision, we will refer to the victim using his initials. In cases where we are quoting from a document, we have substituted Z.R. for his full name.

and observed Tally shooting from his van on the driver's side of the window. Z.R. stated that Tally was shooting out of the window with his right hand looking back towards the house and Tally fired anywhere from 5 to 7 gunshots. One of the bullets then struck Z.R. in his left forearm.

(Tally's last name substituted in place of his first name and "the defendant.")

¶4    Another witness, M.J., told a detective that he is Z.R.'s cousin and the nephew of the woman who was killed. He said he saw Tally driving "a red van outside of the residence." The complaint continues:

Tally began arguing and then got back into the van, drove off a couple of feet, stopped, and then pointed a handgun out of the driver's window and fired 3 to 4 shots at the crowd. After the shots were fired [M.J.] observed defendant Tally smiling as he drove away…. [M.J. said that his aunt] ran to him stating that she had been shot in the chest. [She] then ran around to the north side of the house and collapsed.

¶5    According to the criminal complaint, two detectives executed a search warrant at Tally's home about eight hours after the shooting. They did not recover a firearm, but in a closet they found a packaging box for a "Rossi .38 caliber revolver" along with paperwork identifying Tally's current wife as the purchaser of the gun. In a bedroom, the detectives found unfired cartridges for that type of gun on top of the bedspread, and they also found a box of .38 caliber ammunition with "5 bullets missing from the tray of 50 cartridges." The complaint indicated that an expert who examined three bullets recovered from the crime scene and one recovered from the deceased victim concluded that they were "fired from the same handgun" and that they could have been fired by the type of revolver for which the detectives found the packaging box.

¶6    Tally retained counsel and pled not guilty. The case remained in a trial posture until February 8, 2010, when Tally pled guilty to reduced charges

pursuant to a plea agreement with the State. Specifically, the State agreed to remove the weapons enhancer from the charge of first-degree reckless homicide and to amend the charge of first-degree reckless injury to first-degree recklessly endangering safety. This reduced Tally's overall exposure from ninety-five years to seventy-two and one-half years. The State further agreed to recommend "substantial confinement in prison," but to leave the specific sentence length to the trial court's discretion.

¶7     The trial court conducted a plea colloquy with Tally.[4] As part of that colloquy, the trial court asked Tally whether he had reviewed the criminal complaint and whether "everything in the criminal complaint [is] substantially true and correct." Tally answered "Yes" to both questions. In addition, trial counsel stipulated that the criminal complaint provided a factual basis for the guilty pleas. The trial court found Tally guilty and scheduled the case for sentencing on March 19, 2010. A presentence investigation report was not ordered, in part because Tally did not have a criminal history. ¶8     On March 12, 2010, the trial court received a four-page, handwritten letter from Tally that provided background on Tally's family, work history, and positive character. Tally said that he was "deeply sorry [and] sadden[ed] by the loss" of the woman's life and that he wishes "that day to have never happened." He also said that he hoped the victim's family "will heal an[d] be able to forgive." Tally asserted that he is "not a threat to society and not a bad influence." He stated: "I do understand that there must be punishment for the loss of [the woman] and understand your honor will do

---

[4] The Honorable Jeffrey A. Conen accepted Tally's guilty pleas and sentenced him.

as you see fit." Tally asked the trial court to "show a little compassion and mercy" on his behalf.

¶9   At sentencing, trial counsel emphasized that Tally had "fully accepted responsibility for his actions." Trial counsel said that the crimes are "something that [Tally] regrets so deeply and has such great remorse about that I don't think that there are words that can adequately explain how badly he feels."

¶10   Tally also personally addressed the trial court. He said that he "never intended … for anyone to suffer or lose their life that day." He explained that there were ongoing problems with his ex-wife concerning the custody of their children but he "and the family tried to get along." He told the trial court that he was "truly sorry for what happened," adding: "I really can't find the words to explain why I didn't choose a different route."

¶11   The trial court sentenced Tally to a total of thirty years of initial confinement and ten years of extended supervision. Tally filed a notice of intent to appeal.

¶12   Over the next five years, Tally was represented by two different appointed attorneys and at times proceeded *pro se*. In 2014, he retained new postconviction counsel. Represented by that new counsel, Tally filed a postconviction motion in May 2015. He sought to withdraw his guilty pleas based on the alleged ineffective assistance of trial counsel. The motion alleged that trial counsel performed deficiently by pressuring Tally into pleading guilty and by failing to communicate with him between the plea hearing and the sentencing hearing. The motion claimed that Tally's sister emailed trial counsel on March 13, 2010, and told him that Tally wanted to withdraw his guilty pleas.

¶13     The motion included an affidavit from Tally stating that when trial counsel brought Tally a third proposed plea agreement on February 6, 2010, he told Tally that he "had no defense and should take the plea." Tally's affidavit asserted: "I felt like I had no option but to take it as he was not ready for [a] jury trial." Tally said that the day after entering his plea, he "wanted to withdraw it." He explained: "There were so many issues with the witnesses and I wanted to go to trial." Tally said that he tried to call trial counsel many times. Tally said he also met with another lawyer to discuss plea withdrawal but could not afford to hire him. Tally said that he did not meet with trial counsel again until the day of sentencing, at which point Tally "did not feel [he] had any other choice but to proceed to sentencing."

¶14     The trial court ordered a response from the State, and Tally also filed a reply brief. The trial court denied the motion in a written order.[5] The trial court concluded that Tally had "not set forth any facts to support his subjective belief" that trial counsel "was not prepared to go to trial." The trial court further concluded that, even if it were to assume that trial counsel "was deficient for failing to communicate with the defendant prior to sentencing, the defendant has not shown that he was prejudiced." The trial court noted that Tally had personally written a letter to the trial court prior to sentencing and did not raise any concerns or contest his guilt. The trial court further recognized that Tally did not raise any concerns at the sentencing hearing, and instead "expressed remorse for his crimes and asked for mercy."

---

[5] The Honorable Daniel L. Konkol denied the May 2015 postconviction motion.

¶15    After the motion was denied, postconviction counsel did not continue to represent Tally, so Tally filed a *pro se* notice of appeal. Tally subsequently moved this court to stay the appeal and remand the case so that he could file additional motions in the trial court. We granted Tally's motion and he subsequently filed several *pro se* motions.

¶16    First, on June 6, 2016, Tally filed a "postconviction discovery demand." (Capitalization omitted.) Tally asserted that the police tested his hands and his red van for gunshot residue when he was arrested at his home "[r]oughly fifteen minutes after this crime took place."[6] Tally's motion indicated that he had not received results for the gunshot residue test. He said that he "should be able [to] receive the test results and/or have the [test completed] if the [S]tate has not done so thus far." Tally argued that, if the gunshot residue test results were negative, "it would be far-fetched to bel[ie]ve that Tally would take a plea knowing that he did in fact have a defense to show the jury that the probability of him firing those shots that killed [the woman] and wounded [Z.R.] is unlikely to have occurred." Tally said that he "would not have taken a plea and [would have gone] to trial as he desired to do from the beginning of this case."

¶17    The trial court denied Tally's postconviction discovery demand.[7] In doing so, the trial court said that Tally's assertions were "insufficient and inconsequential." The trial court explained:

---

[6] On appeal, the State points out that the property inventory report that Tally relies on suggests that the van was swabbed for DNA, rather than gunshot residue. For purposes of this appeal, however, we will accept Tally's assertion that both his hands and the van were swabbed for gunshot residue.

[7] The Honorable Dennis J. Flynn, Reserve Judge, denied the motion.

> Even if it could be shown that there was no lab report linking the defendant to gunpowder residue, there were witnesses who saw the defendant shoot a gun at the victims…. Based on the type of evidence the State could have produced in this case, there is not a reasonable probability the outcome of the proceeding would have been different. [Case law] requires a strong showing of success based on the particular evidence sought. Even if a lab report was generated which was favorable to the defendant, he has still not met the [case law] threshold.

¶18    After his motion was denied, Tally filed two additional motions. On June 29, 2016, he filed a postconviction motion seeking plea withdrawal based on ineffective assistance of trial counsel. He argued that trial counsel performed deficiently by "fail[ing] to conduct an adequate investigation … before advising Tally to take a plea deal." He stated: "In this case, based on the fact that Tally maintained he was not the shooter, [trial counsel] had a duty to thoroughly investigate on Tally's behalf, which would have led him to the gunshot residue evidence that is now in question." Tally also reiterated his prior complaint that trial counsel failed to communicate with him when he wanted to withdraw his plea prior to sentencing.

¶19    On June 30, 2016, Tally filed a motion for reconsideration concerning his motion for postconviction discovery. He provided additional reasons why he believed he was entitled to the gunshot residue test results.

¶20    On July 19, 2016, the trial court denied both pending motions in a written order.[8]    The trial court first denied the motion for reconsideration concerning postconviction discovery. Next, the trial court rejected Tally's attempt to relitigate the lack-of-communication claim that was denied in 2015. Finally,

---

[8] The Honorable Jeffrey A. Conen denied the motions.

8

with respect to Tally's claim that trial counsel should have found evidence concerning the gunshot residue test, the trial court concluded that Tally had failed "to show how counsel was ineffective by producing hard facts in support of his claim." The trial court stated: "The defendant's motion is completely conclusory and speculative at best."

¶21    After his motions were denied, Tally retained counsel to represent him on appeal. This appeal follows.

## DISCUSSION

¶22    On appeal, Tally presents two primary arguments. First, he argues that the trial court erroneously denied his motion for postconviction discovery. Second, he argues that the trial court erroneously denied his motion for plea withdrawal without granting him an evidentiary hearing.[9] We consider each issue in turn.

### I.  Denial of the motion for postconviction discovery.

¶23    Tally sought postconviction discovery pursuant to ***State v. O'Brien***, 223 Wis. 2d 303, 588 N.W.2d 8 (1999), which held that "a defendant has a right to postconviction discovery when the sought-after evidence is consequential to the case." *See **id.*** at 323 (hyphen omitted). ***O'Brien*** continued: "[W]e hold that a party who seeks postconviction discovery must first show that the evidence is

---

[9] On appeal, Tally has not pursued his claim that trial counsel performed deficiently by failing to communicate with him between the plea hearing and the sentencing hearing. Therefore, we conclude he has abandoned that issue, and we will not discuss it. *See **Reiman Assocs., Inc. v. R/A Advert., Inc.***, 102 Wis. 2d 305, 306 n.1, 306 N.W.2d 292 (Ct. App. 1981) (holding that issues not briefed are deemed abandoned).

consequential to an issue in the case and had the evidence been discovered, the result of the proceeding would have been different." ***Id.*** (hyphen omitted).

¶24 The trial court, applying ***O'Brien***, concluded that Tally's "assertions [were] insufficient and inconsequential." On appeal, the parties disagree on the correct application of ***O'Brien*** here, where Tally's convictions were based on his guilty pleas rather than jury verdicts. Specifically, Tally argues that the issue is whether the gunshot residue test results were consequential to his decision to plead guilty, and he asserts that "if the results of the gunshot residue analysis were favorable to him, he would not have pleaded guilty." (Footnote omitted.) In contrast, the State argues that "[e]ven when a defendant is seeking plea withdrawal, he must prove that the desired evidence would probably result in an acquittal at a trial."

¶25 The parties have not identified any published case law that has considered whether a defendant who pleads guilty can seek postconviction discovery pursuant to ***O'Brien*** and, if so, whether the defendant must demonstrate that the evidence would have affected his decision to plead guilty or, instead, that the evidence would have resulted in an acquittal at a trial. We decline to definitively decide those issues. Even if we accept Tally's assertion that he is entitled to postconviction discovery if he can demonstrate that the gunshot residue test results were consequential to his decision to plead guilty, and even if we apply a *de novo* standard of review to the trial court's decision as Tally urges us to do, he is not entitled to postconviction discovery because his motion was inadequate.

¶26 Tally's motion was deficient in several ways. He failed to adequately explain why, if he had been told the gunshot residue tests were negative, he would have chosen to proceed to trial instead of entering guilty pleas.

He suggested that negative test results would create "a defense to show the jury that the probability of him firing those shots … is unlikely to have occurred." However, he did not address the fact that two eyewitnesses—including his nephew—claimed that they observed Tally arguing with family members and firing the gun from his van. Tally's motion also did not discuss the evidence that detectives recovered from his home, including gun cartridges on the bed and the empty box for a type of firearm that could have been used to fire the bullets recovered from the crime scene and the deceased victim. In short, Tally did not adequately allege why the lack of gunshot residue on his hands would have been a consequential factor in his decision to proceed to trial, given the other significant evidence that he was the shooter.

¶27    Tally's motion also did not provide sufficient information about the conclusions that can be drawn from the lack of gunshot residue. Further, he did not provide any support for the proposition that, if the State has not yet tested the swabs of his hands for gunshot residue, those swabs could still be tested years later and yield dependable results. Tally claims that he would like to consult an expert, but he could have done that prior to filing his motion.

¶28    For these reasons, we conclude that Tally has not shown that the gunshot residue test results would have been consequential to his decision to forego a trial and plead guilty. We affirm the denial of Tally's motion for postconviction discovery.

**II. Denial of the motion for plea withdrawal.**

¶29    Tally argues that the trial court should have held an evidentiary hearing on his motion for plea withdrawal alleging ineffective assistance of trial counsel. The law does not automatically entitle a defendant to an evidentiary

11

hearing on his postconviction claims. *See State v. Bentley*, 201 Wis. 2d 303, 310-11, 548 N.W.2d 50 (1996). The trial court must conduct a hearing only if the defendant "alleges sufficient material facts that, if true, would entitle the defendant to relief," which is a question of law we review *de novo* on appeal. *See State v. Allen*, 2004 WI 106, ¶9, 274 Wis. 2d 568, 682 N.W.2d 433. The motion must "allege the five 'w's' and one 'h'; that is, who, what, where, when, why, and how." *Id.*, ¶23. If the motion does not raise sufficient facts, merely presents conclusory allegations, or if the record establishes conclusively that the defendant is not entitled to relief, the trial court may grant or deny a hearing in its discretion, which we review for an erroneous exercise of discretion. *See id.*, ¶9.

¶30 The two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), governs claims that counsel was constitutionally ineffective. *See State v. Balliette*, 2011 WI 79, ¶21, 336 Wis. 2d 358, 805 N.W.2d 334. The defendant must show both that counsel's performance was deficient and that the deficiency prejudiced the defense. *See Strickland*, 466 U.S. at 687. A court may consider either deficiency or prejudice first, and if the defendant fails to satisfy one prong, the court need not address the other. *See id.* at 697. To prove deficiency, a defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. To prove prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

¶31 With those legal standards in mind, we consider Tally's claim that his trial counsel provided ineffective assistance. As noted, Tally's June 29, 2016 postconviction motion asserted that trial counsel performed deficiently by not adequately investigating the gunshot residue evidence. Tally argued that he was

prejudiced because if trial counsel had "advised Tally that he could proceed to trial with a probability of proving that he was not the shooter, Tally would not have taken a plea of guilty and [would have] attempted to prove his innocence."

¶32    We conclude that Tally was not entitled to an evidentiary hearing on his motion because he presented only conclusory allegations.  *See Allen*, 274 Wis. 2d 568, ¶9.  In making his arguments, Tally alleged that he "maintained that he was not the shooter."  However, he did not indicate when he told trial counsel he was not the shooter or address why his trial counsel would allow him to accept responsibility on multiple occasions if Tally maintained his innocence.  Tally also did not explain why he admitted his guilt at the plea hearing, in a letter to the trial court before sentencing, and at sentencing if, in fact, he was not the shooter.

¶33    Further, the motion baldly asserted that trial counsel did not investigate the gunshot residue testing, but it offered no evidence to support that claim.  The motion also did not offer Tally's theory of defense.  For instance, Tally did not explain whether he intended to suggest he was present at the family gathering but was not the shooter, or whether he planned to argue that someone else was the person who argued with the family members and fired the gun.

¶34    The motion was also conclusory because it asserted that Tally would have proceeded to trial if he had learned that the results of the gunshot residue test were negative, but Tally did not even attempt to explain how the existence of two eyewitnesses and the physical evidence found at his home would have factored into his decision to proceed to trial.  Further, he did not adequately explain how negative gunshot residue tests could create "a probability of proving that he was not the shooter" in light of that other evidence.

¶35 In summary, Tally's motion was conclusory with respect to both his allegations about what trial counsel knew and should have done and with respect to how trial counsel's actions allegedly affected Tally's decision to plead guilty instead of going to trial. We conclude that Tally was not entitled to an evidentiary hearing. *See id.* Therefore, it was within the trial court's discretion to deny the motion without a hearing, and we discern no erroneous exercise of that discretion. *See id.*

## CONCLUSION

¶36 For the foregoing reasons, we reject Tally's arguments challenging the denial of both his motion for postconviction discovery and his motion for plea withdrawal. We affirm.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.